The first case on our call this morning is agenda number 19, case number 104-983, Connie Mikolajczyk v. Ford Motor Company. Mr. Braun, you ready to proceed? Good morning, Your Honors. This case presents the next natural question after your decision in the Callis case, and that's in a case that involves only risk-utility evidence involving a complex product used in unfamiliar circumstances, whether it is reversible error requiring a new trial where the trial court instructed the jury. I'm sorry, Mr. Braun, did you identify yourself for the record? I'm sorry, Your Honor. Bruce Braun on behalf of Ford Motor Company. Thank you. The issue, Your Honors, is whether in that circumstance it is reversible error requiring a new trial where the court gave the jury the instructions under the consumer expectations test. Consumer expectations test asks the jury questions that have nothing to do with the risk-utility evidence, and we submit, Your Honors, that the answer is that a new trial is required. It is error to use consumer expectation instructions in a risk-utility case. We ask the court to reverse for two related but independent reasons. First, the jury instructions here did not match the evidence or, I'm sorry, did not match the law. They did not accurately state the law for strict liability design defect cases involving complex products in unfamiliar circumstances. This Court's decision in Callis in blue showed the court has moved away from the section 402A consumer expectations test in most cases and instead has evolved to section 2 of the restatement third in most cases which involve complex products such as the safety-enhanced yielding seat which was involved in a massive rear-end collision in this case. As Callis in blue made clear, the consumer expectations test and the consumer expectations instructions are reserved for cases involving simple products used in everyday life where a consumer or juror's everyday experiences can lead it to a conclusion about whether the product design is defective. Mr. Braun, since you're hinging your article on blue, or your argument on blue, rather, your contention isn't that blue changed the law to somehow overrule Lampkin and Hanson, is it? Certainly not, Your Honor. Our position is that both Callis and blue are completely consistent with the decision in Lampkin. Lampkin, in 1990, said that there are two alternative tests that a plaintiff may choose to prove design defect in strict liability cases. What blue and Callis do is they refine that decision in Lampkin and make clear when each test is appropriate. So in no way do blue and Callis overrule Lampkin. What they do is they make clear that consistent with the restatement third and the criticism from Prosser and Keaton and other courts and other commentators, that the consumer expectation test is inappropriate in most cases. In most cases involving design defects, it involves complex products used in unfamiliar circumstances such as we have here. So our position, Your Honor, is that Lampkin, Hanson, all of the cases leading up to blue and Callis are consistent with blue and Callis. Blue and Callis do not create any new law or new rules. They only clarify when those two tests can properly be applied. Are you saying that a complex product is per se exempt from the consumer expectation test? No, Your Honor, we're not. I think it's clear from Callis and the authorities that Callis cites and relies upon that the consumer expectations prong or test is part of a proper risk utility analysis. So when you have a complex product such as the CT20 yielding safety enhanced seat here, consumer expectations can be part of that inquiry. The problem with consumer expectations as an independent test is that with products like that, with complex products which consumers don't have everyday experience with, consumers don't have expectations. That test provides no guidance and as the restatement authors themselves noted, that creates a very difficult position for manufacturers like Ford and results in something close to that. Ford cannot design a seat that's safe in all the ranges of accidents. All it can do is a risk utility analysis. So to answer your question directly, no, we believe that the consumer expectations analysis is part of the risk utility test. So our instructions, the civil instructions are incorrect? Is that the position? Yes. Your Honor, just so that we are very clear, we believe that the IPI instructions on consumer expectations when given in a risk utility case are error. They do not properly state the law. They don't provide guidance to the jury. And let me explain to you what happened here. Here we had a jury that heard two weeks only of risk utility evidence, nine expert witnesses testifying about very complex issues about safety, seat design, forces that a seat can withstand and not withstand, how much it yields, how much it shouldn't yield in front end, rear end collisions at different speeds. The jury instructions here gave the jury no guidance on what to do with any of that evidence, none whatsoever. The jury instructions here said, jury, you need to find out, decide whether this seat is unreasonably dangerous. And unreasonably dangerous was defined just as unsafe when put to a foreseeable use. And we submit that that allowed the jury here to, the jury could have found for Ford under the risk utility test, but still delivered a verdict for the plaintiff here because we'll never know this, but the jury could have said, well, Ford, you've proven that the benefits of the CT20 yielding seat outweigh the risks. And you've also proven that there was no feasible alternative which would have prevented or reduced the harm. But under the instructions that were given to us, the jury, the seat was unsafe for Mr. Michalacek because he wasn't saved in this accident. He was killed. Why couldn't the jury use the risk utility evidence to evaluate the case under the instructions that were given? Well, it's possible they could have. They just had no understanding of what to do with that evidence. The instructions provided them with no guidance. The jury was left untethered to any rule of law. The jury was just instead left to decide, was it unsafe? And all of the evidence it heard was about risks and utilities and benefits, but the jury was just left to decide, was it unsafe? And unsafe here could lead the jury just to decide, well... So really your argument hinges on this court believing that the risk utility test was the only appropriate test to use under the law. Is that right? In this case, Your Honor, yes. The risk utility test was the only proper test to use. And if we disagree with that and think that Lampkin holds that the plaintiff can choose, well then your argument as to the jury instruction would then fall. No, Your Honor. It would not, because although if you were to hold that Lampkin lets a plaintiff choose, here there are two problems with that argument. First of all, Lampkin makes clear the plaintiff chooses by the evidence he or she introduces. And here the only evidence that was introduced was of risk utility. That's the first problem. The second problem, Your Honor, is even if the plaintiff could choose, and even if the plaintiff could choose consumer expectations, even though all her evidence was risk utility, Ford's defense was risk utility and all of its evidence was risk utility, and it was entitled under the decisions of this court to an instruction that instructed the jury on its theory of defense. So either the instructions were wrong, or even if they weren't wrong, we were entitled to our instruction. Now we submit that Lampkin makes clear, and Callis makes clear too, Callis says, look we'll decide at summary judgment which test you can, which test can go to the jury. You, the plaintiff, have to produce evidence of either consumer expectations and risk utility. And Callis recognizes, it cites the Soule case from California, and in the parenthetical to the Soule case it says, consumer expectations are reserved, that's the word, they're reserved for the cases where consumers have everyday experiences about the products. And it also goes on to say that risk utility must be used, must be used in all other cases. In here, the plaintiff could not show that any consumer would have any expectation or everyday experience about how someone would design a safety enhanced seat to deal with a massive rear end collision, when the manufacturer also has to deal with a massive front end collision, has to deal with a rollover, has to deal with all types of bodies, all body of high speeds and low speeds. The design decisions that go into what makes up a seat are complex and difficult, and they're beyond the ken of any ordinary juror. They require engineering experts, and those experts came in and testified here. Now, after hearing nine experts, the jury was left completely without any guidance of what to do with any of that evidence. Well, there were instructions made, I'm sorry, there were closing arguments in which you argued the risk utility test. Yes, there were, Justice McGerald. There were closing arguments, and both sides argued risk utility. But then the jury got instructions, which pretty much threw the argument out the window, at least as far as the lawyers tried to guide the jury. This Court's been clear that closing arguments by lawyers are just argument, they're not evidence, and the jury has to follow the instructions. That's the purpose of the instructions, to guide the jury on the law. The jury looks to the judge, not the lawyers, to tell it what it needs to do with the evidence. And here, the jury was given instructions that left it to its own device about what it wanted to do. Even though it heard all about the risks and the benefits and the possibility of alternative designs, it was left only to decide, was this car unsafe when put to a reasonably foreseeable use? And unfortunately in our society, drunk driving, rear-end collisions are foreseeable. And was it unsafe? Well, the jury was given no guidance on how to determine it was unsafe. The judge just gave it instructions that unsafe was the inquiry for unreasonable danger, and clearly a jury could decide it was unsafe here because the seat did not prevent the injuries to Mr. Michalacek. But that's not the standard the law requires. The standard the law requires is that the plaintiff prove that Ford erred in its risk utility analysis, and as the plaintiff suggested, that there were alternative feasible designs. And we believe that the plaintiff failed in that burden as well, but clearly the jury, although it heard arguments from lawyers, received no guidance whatsoever. There's nothing in the instructions that gave the jury any idea what it was supposed to do with this evidence. As the Callis Court makes clear, the law like nature has evolved, and the instructions should evolve with the law. Callis, I think, very clearly decided the issue of what circumstances consumer expectations can be used and which is why would it be appropriate, under what circumstances would it be appropriate to mix and match instructions. And the court in Callis wasn't presented with that issue. In Callis, the case came to the court on summary judgment. Here, it's the second foot falling, the second shoe falling. The question for this court is, if you have a case which is unmistakably risk utility, because all of the evidence here is risk utility, the plaintiff objected to the only consumer expectation evidence that was offered, and it was stricken from the record. So the case was always risk utility from the beginning to the end. Everyone argued risk utility, yet at the jury instruction conference, the plaintiff says, I have a consumer expectation case. That's manifestly unfair. There's no basis for it in equity or law, and the instructions are guided by the evidence. The instructions have to be guided by the law and the evidence, not by the whim of the plaintiff at the end of her case deciding that she wants instructions that, in her mind, lower her burden. She did not proceed under consumer expectations. She was unable to here because that test is inapplicable as made clear in Callis and prior cases. So the failure to approach the case or try to prove her case through consumer expectations forecloses her right or ability to ask for consumer expectation instructions. Ford proposed risk utility instructions that accurately set forth the law on risk utility. They provided the jury with all the guidance it would have needed to have made its determination under the law and the facts that were presented to it, but the jury did not get those instructions. The consumer expectations instruction that the jury did receive effectively imposed absolute liability on Ford because Ford now faces the dilemma of how it can design a car seat that can be safe for all occupants in all accidents and all types of speeds and directions. The plaintiff here sued because the seat didn't yield enough in a massive rear-end collision. The evidence was clear that this seat is safer in low-end, low-speed rear-end collisions and in frontal collisions. That's directly from the Michelechuk decision by the First District. So Ford could now be sued by someone claiming that the seat wasn't rigid enough if they were injured in one of those accidents. The thrust behind the risk utility test is set forth in the restatement and in the cases that have adopted it is it allows the law to arrive at one reasonable result. And that's, it also serves the function of serving social welfare because the risk utility test, with instructions to match it, provide the jury with guidance in determining what optimal safety should be achieved. The consumer expectations test with the instructions that were submitted were given to the jury, they would require the manufacturer to try to guarantee absolute safety, which is both impossible to provide and has significant costs to society. Briefly, Your Honors, on the issue raised in the cross petition regarding remittitor, we believe that all of the issues raised by the plaintiff are without merit. The Court of Appeals clearly applied the correct standard of review. The Court of Appeals quoted the language from Richardson that it will not lightly substitute its judgment for the jury's judgment. That is the exact same language that was cited by the plaintiff's brief to the court and then the court carefully looked at the evidence presented by the plaintiff and applying that deferential standard found that the award could not withstand judicial scrutiny. Now, not only did it apply the correct standard of review, it also clearly applied the correct standard. The plaintiff has submitted that the Richardson test doesn't mean what it says when it has a three-part test, but Richardson does say what it means in every case that the plaintiff cites and the court cites applies that same three-part test. The award is either unjust because it's not fair and reasonable compensation, it's the result of passion or prejudice, or it shocks the judicial conscience. Those standards are clearly in the disjunctive. The plaintiff would suggest that the fair and reasonable compensation component does not exist, but provides no basis for that in fact or in law or from any of the court's opinions and also doesn't suggest why that shouldn't be the standard. Why should a court ignore awards that are not fair and just compensation? The remaining arguments regarding the remediator are completely without merit. The appellate record was fully complete, unlike the case in Barton, which involved silent videos and other information that the Court of Appeals found to be important. And also, the completeness of the record was an issue that was not raised at all below by the plaintiff, so we believe it's waived. I'll save the remaining time for rebuttal if there are no further questions. If the risk utility test is adopted, then we need not reach the remediator issue, do we? That is correct, Your Honor. If the risk utility argument is, if you find that the instructions were error, we believe the case would go back to the trial court for a new trial on both liability and damages. Thank you, Mr. Brown. Thank you. Mr. Paff. Mr. Paff and I represent the estate of James Michalajczyk, Your Honors. It was three years and eight days ago that Judge James Flannery had to make the call as to what the proper jury instructions were in this case. It was shortly before the case was to have been argued. There was no whim as to plaintiff's choice to try this case under the IPI 400-06, which was exactly what was done. That was briefed pre-trial. There were memoranda of law given to Judge Flannery before a jury was ever picked. This was a dispute that began before this trial, and the court was fully aware of it, as was Ford and Mazda. They're both defendants in this case. Those defendants were not surprised when plaintiff wanted the IPI 400-06 before trial. Why did plaintiff want that instruction? Number one, plaintiff tendered it because it's in the IPI. This court's rule, 239A, mandates that that instruction be used unless it's clearly error. No case has ever held the IPI's definition of unreasonably dangerous to be improper in any way. None. The Savada case in 1965 established that the basis of strict liability is selling an unreasonably dangerous product. Some states define that term. Illinois does. Illinois has had that as part of the IPI since the 1980s. That definition, unsafe when put to a use that's reasonably foreseeable considering the nature and function of the product, has been accepted in every case that has analyzed it. Sitting as the trial judge, Judge Flannery had that record in front of him, those appellate cases. What else did Judge Flannery have? He had the decision in Carrillo v. Ford Motor Company. Same lawyers, same judge, same courtroom, same rear impact, same horrible injury. In that case, it was paralysis. Same charging allegation. The identical jury instructions in the Mikolajczyk case, the 400-01, 02, and 06, were used in Carrillo. They were approved by Judge Flannery in Carrillo. The appellate court affirmed their use in very specific language. At 966 of Carrillo, the instructions the jury was given in this case fully, fairly, and comprehensively informed the jury of the relevant legal principles. Sitting as the trial judge, it would have been an enormous abuse of discretion for Judge Flannery not to follow the IPI and not to follow the precedent of Carrillo. In addition, Hansen had come down shortly beforehand. Hansen made clear, the appellate court had said that the IPI instruction, 400-06, was appropriate for use in that case. It is our position in this case, Your Honor, that 400-06's definition of unreasonably  appropriate for use in that case. It covers cases where there's evidence of risk utility, and it covers cases where there are consumer expectations evidence. This case included both types of evidence, and it's not unusual. Plaintiff put on expert testimony that the product was unsafe. Plaintiff put on expert testimony that this occurrence was reasonably foreseeable to the defendants. Ford rebutted that. They put on their own foreseeability, but Ford did rebut the consumer expectation evidence that we had that this product was unsafe. The next thing that happens in most trials when a plaintiff is putting on an expert in a product's case is, Mr. Engineer, why is this product unsafe? And the engineer will typically describe, as was done in this case, what the risks of danger are from the product. So inexorably, there are both types of evidence in the case. And Lampkin holds, and the cases that have followed it through Calus hold, that that type of evidence is appropriate for the determination of whether a product is unreasonably dangerous, both evidence of consumer expectations and evidence of risk utility. When counsel references the Sewell case from California, there's a problem with that because California's standard of product liability is somewhat different from Illinois, and their jury instruction is dissimilar from 400.06. 400.06 requires the plaintiff to prove more than the California test, which is the product is defective. They use different language and actually has some different meaning as well. Product is defective in California when it fails to perform as safely as a consumer would expect. That's a lower burden than we have in Illinois. And I believe the IPI more than 20 years ago correctly stated what unreasonably dangerous means, as unsafe when put to a use that's reasonably foreseeable. People defending these cases put on evidence to show why their product performs in a safe manner, why it's reasonably safe, et cetera. The plaintiff has to go all the way to get the jury to believe it's unsafe, which is a high burden and I think effectively encompasses the evidence in this case. Judge Flannery also had no evidence on the other side to favor the argument that 400.06 was improper. No court had ever held that that definition of unreasonably dangerous was improper. The IPI committee over the past 20 years has made some substantial changes to the 400 series. But as we pointed out in our appellate court brief, never once has there been a change to the instructions used here, 400.01, 02, and 06. The IPI committee is well aware of Lampkin. The IPI committee is aware of Callas and the cases that come between, but has elected not to change the 400.06 instruction. And I think that bears some weight here. The jury in this case decided for the plaintiff because the evidence was overwhelming. The jury found in this case that Mr. Mikulajcic would have suffered only minor injuries in a seat that was not unsafe. That was our proof and that is something that Ford takes issue with in their reply that I must dispute. Ford says that all seats are unsafe in a crash like this. That, frankly, is disrespectful to the record in this case. The record in this case shows that Jim Mikulajcic, had he been in a safe seat, would have essentially been a walk away. He would have been fine. He would have suffered some minor injuries. His daughter in the back seat who was far closer to the impact forces and who was in a very strong seat had some fractures of her lower extremities and she's fine. That would have been the outcome for Jim. He would have been fine. But for this unsafe seat, necessarily the jury had to find that. We put on test evidence in the case to show that Jim Mikulajcic that a severe or fatal injury was more than ten times more likely in an escort seat than in feasible alternative seats. More than ten times. Those crash data were never challenged successfully. Ford wishes to say that their seat performs better in low speed collisions, but our crash data, which was it before the jury in visual form and a graphic form, proved otherwise. The strong seats that we favored were as safe as the escort in low speed occurrences and far, far safer in higher speed occurrences. Post-trial, Judge Flannery had a full opportunity to review the record and the evidence. He found that there were no errors that affected this case. He found that the jury's deliberations and the jury's finding on damages were reasonable. He used a proper test. He analyzed, in fact, whether or not the verdict was acceptable. He found that the verdict was excessive, whether it shocked the judicial conscience, whether it was affected by bias, sympathy, passion, or prejudice. And he answered no to all those questions. Respectfully, Judge Flannery was in a position to see this entire trial, judge the credibility of all the witnesses as the jurors did. And that decision, denying a new trial on damages and denied remitted her, is entitled to substantial deference by reviewing courts. We believe the appellate court in this case did not pay that deference that was due. The appellate court never used the proper standard, which was it had to find that Judge Flannery abused his discretion in saying that the verdict was within the realm and was not excessive. What about Supreme Court Rule 366 that says that the appellate court in its discretion may enter a remittiture? The appellate court has that power if it finds that the trial court abused its discretion. That was never found here. So it's double discretion? I believe it is, Your Honor. And with respect to 366, the order from the appellate court here is very unusual, we believe, because the three justices, only one had his judicial conscience shocked, and one of the justices felt that the verdict was only slightly excessive. Those justices could not form, the appellate court has the power, of course, to say the excessive amount of the verdict is X dollars and remit it to a specific number, which it could not agree upon and could not do in this case. Unfortunately, remanding the case to go back to the trial court, to the judge who previously decided the verdict was not excessive, and directing him to reduce the verdict. That, we believe, is an abuse of discretion. One last point, with respect to the jury. They gave, actually, Mr. Papp, they gave some guidelines, right? They said seven figures, but not more than half, something like that? Justice Griman wrote that in his opinion. I don't believe that it can be fairly said Justice Campbell or Justice Murphy exactly agreed with that. And therein lies the rub. We have a situation where Justice Griman in one case, three years or four years earlier, affirms $18 million in loss of society damages, but yet in this case says, for reasons that cannot be fathomed, that certainly he would favor a seven-figure award. I don't know that the Illinois courts should ever get to the point of comparing verdicts to decide excessiveness. I don't think that even matters to what should be the outcome on the remediator issue here. Because if we're comparing, this is not out of line with other substantial verdicts and settlements in the realm of loss of society damages. If we're not comparing, then we get back to the trial court, the trial court's discretions and findings, whether or not the verdict shocked the conscience or was the result of passion and prejudice. It is not your position, is it, that the appellate court had to come up with a number? I think it's unusual that it did not. The appellate court does have the power to do what it did here. But frankly, I think that shows a lack of clarity in their opinion in that regard. If we sent it back on the loss of society issue, would you have any additional evidence to put in? Or is all the evidence that you would submit is currently in the record? Well, Your Honor, it's been over three years since this case was tried, and the Michalajczyk family still suffers loss. There would be additional evidence. So we could not make a determination here or reduce the award here or? Well, when this case was tried, Your Honor, it was, the jury was to evaluate past damages and future damages. So realistically, it's within this court's power, if it chooses, which I would respectfully hope not, to enter remitted or to a specific number. I do want to point out the Sobchak case versus General Motors on the issue of consumer expectations and products that could be called complex. In Sobchak, a directed verdict was entered in an auto products case on the consumer expectation prong of plaintiff's case. The first district reversed that and said there was sufficient evidence for that auto products case to go to the jury on consumer expectations. So the current law in Illinois is the consumer expectations with auto products cases is alive and well and should be. And frankly, the test of 400.06 is a little bit broader than consumer expectations. It clearly encompasses it as well as the risk utility evidence here. With respect to a reply brief by Ford, I would have some dispute that I wish to point out to the court. Ford, in its reply, says that Illinois cases require risk utility instructions and CITES IV cases. When there's risk utility evidence, that's actually incorrect. It's in the reply at page 22. Those cases all stand for the view that the court in its discretion may give an alternative feasible design instruction as was mentioned in the Kearns case. But alternative feasible design is different from risk utility. There is no case under Illinois law that requires a risk utility instruction or that even approves a specific risk utility instruction. One point that should not be lost is that a party has the obligation, as Ford and Mazda did in this case, when it submits instructions to submit them to correctly state the law. Those that they submitted in this case did not correctly state the law for the reasons that we cited in our brief. They incorporate language of defect, which again comes from California, which has never been part of the Illinois burden. They put a dual burden on the plaintiff to prove design defect and unreasonably dangerous conditions. And as this court has held, I believe it's in the Sweeney case, that unless they submit a proper instruction, the trial court's refusal to give an incorrect instruction is not error. And that's from Sweeney v. Matthews. So even if this court felt that somehow the IPI was not fully adequate, which we would dispute, Ford never submitted an adequate instruction. And for that, that's an alternative basis on which its liability should be affirmed here. Ford must not only persuade this court that the trial court's instructions amounted to an abuse of discretion, but Ford must also persuade this court that its tendered instructions were proper statements of the law. It cannot do either, but it must do both if it is to have this court's judgment. I wanted just to touch briefly on three cases that share the same facts as Mikulajczyk, Carrillo, Newman, and Potter. Every one of those cases was tried to a plaintiff's verdict. Every one of those cases had the same expert testimony, the same experts. Every one of those had instructions on unreasonably dangerous condition, just as Illinois does and used. And those states follow the consumer expectation test. In every one of those cases, there was some challenge to the jury instructions. In every one of those cases, the instructions were affirmed and the judgments were affirmed. Ford has cited no case in which its weak seat design has been tried under risk utility and that they come to a different result. And in fact, there's just no authority for the risk utility specific instructions that they're trying to ask this court to direct the IPI committee to draft. Respectfully, I think the current instruction is more than adequate. On the subject of damages, this court's opinion in Snelson is very important because, in effect, it adopts the rule that plaintiff proffers in this case that predate Richardson. Cases, obviously, jurors are to decide facts under the constitutional right to trial by jury. The common law allows for remitted or an editor under very limited circumstances. And the question is, what are those circumstances? In Snelson, this court correctly analyzed it to be a disjunctive two-part test as opposed to a three-part test. The test from Snelson was, if, in fact, the verdict shocks the judicial conscience, it's outside the range of fair and reasonable compensation.  And the other part is passion and prejudice. Richardson says something different, and frankly, we believe that Richardson misstated the test. The two cases Richardson relies on say something different than what Richardson says. Snelson is a much more recent authority from this court and should govern that test. In Snelson, this court will remember the trial court did remit the verdict, and this court found that that was improper and an abuse of discretion. And this court reinstated the verdict. Respectfully, that is exactly what should happen here. This jury could have awarded more damages than it did. It could have awarded less damages than it did, but it chose a number. And it chose a number after almost three weeks of jury trial, after arguments of counsel. Counsel got to say everything that they wished to say. There is no debate that improper evidence was received on damages. There is no debate that there was improper argument about damages. There is no claim that improper instructions were given about damages. The only complaint from the defense is, well, we lost, and we lost too much, and we're not happy about it. That's not the legal test. They had a full opportunity to challenge damages in closing argument. They elected not to. They put their strategy into sole proximate cause and tried to blame everything on the other motorist, and it failed. Respectfully, that is not a basis to overturn a jury award in a fully fair trial. Respectfully, Your Honors, that concludes my argument. Thank you, Mr. Paff. Rebuttal, Mr. Brown. Briefly, Your Honors. Mr. Paff makes the mistake of arguing that no case has ever struck down the IPI and relying on Hanson, Callas, and Carrillo, but if you read those decisions front to back, and you read the lower court decisions in those cases, it's apparent that the jury instructions were never at issue. Courts don't decide issues silently. Those cases did not present the issue here, which is in wake of Callas, when you have a risk utility case where you can present consumer expectation instructions to a jury and expect the jury to reach a fair and just result. Now, the fact that the IPI committee has not changed the instructions only points to the fact that the change is long overdue. The change should have occurred in Lampkin. After Lampkin, when the court announced there were two possible tests, the change should certainly occur now after Callas, and the court has made clear that risk utility is the predominant test. Now, Mr. Paff argues that the jury found that Mr. Mikulakich would have only suffered minor injuries and would have walked away had there been a rigid seat, but we'll never know that because the jury didn't get any guidance that would tell us what it found or what it didn't find. All it had to find was that it was unsafe, and unsafe there only meant that he didn't live. The seat did not protect him, so therefore the jury found that Ford was liable, but that's not the standard under the law. The standard under the law is whether the risks outweigh the utility and whether there was a feasible alternative. The Sobchak case, we would submit, is a very good case for this court to consider. Sobchak case, the court did find that consumer expectations were appropriate with a car, but that case involved a situation where a person was driving a car, and in revving the engine the car exploded because the heat shield failed. And the court correctly found that although consumers might not have expectations about the heat shield, which would require expert testimony, certainly the consumers would have everyday experiences about whether revving your engine would cause your Astrovan to explode, which happened there. So Sobchak supports the conclusion that the consumer expectations test is appropriate in the limited circumstance where the product is familiar, a car, used in familiar circumstances, someone driving and revving the engine. Consumers would have an expectation that just like climbing a ladder, the ladder wouldn't collapse. Consumers have an expectation that driving a car, the car won't explode on its own. Consumers don't have expectations or experiences with how to design a safety-enhanced yielding car seat and the degree to which it should be flexible in the broad range of accidents that Ford faces. Mr. Paff argued that proper deference was not paid to Judge Flannery in his decision. Well, Judge Flannery, with all due respect, is entitled to no deference on what the legal standard is. That's a de novo issue for this Court to review. This Court doesn't need to sit through the trial to hear the witnesses and judge their credibility to determine whether the legal standard was incorrect. That's an issue this Court can decide and should decide. And contrary to his argument, the Court of Appeals did provide substantial deference on the areas where he was entitled to substantial deference, and that was on the issue of damages. And the Court applied the correct standard. The Snelson decision, which comes before the Trigee decision of this Court, in which the Court clearly applied the Richardson standard as we suggest it should be applied, the Snelson decision is entirely consistent with Trigee and with Richardson and with the decision below. Because where the Court there found that the award has to bear a reasonable relationship to the loss, that's just another way of saying that it has to be fair and just compensation. The dilemma Ford faced is best shown here, I think, by what happened with the daughter in the back seat that you heard about. The daughter in the back seat survived the accident with fairly minor injuries, and she did so because Ford had a yielding seat. If there had been a rigid seat in front of her, she would have been catapulted into that rigid seat and would have suffered much more serious injuries. That was precisely the evidence that was adduced in the trial court below. And finally, Your Honors, to the argument that Ford's instructions did not properly state the issue of law, Ford's instructions did accurately and fully state the risk-utility test. Nothing that the plaintiffs point to suggests that our instructions were in any way defective or incorrect. The use of the term defect doesn't put any additional burden on the plaintiff. No court has ever held that. The court, the instructions used the unreasonably dangerous standard. It defined unreasonably dangerous, and it set forth all of the elements of risk-utility. In a design defect case, there can be no complaint by the plaintiff if the instruction uses the term design defect, when it also contains all of the other elements that are necessary for the jury to make its finding. The Soule case is a case from California. But this court shouldn't follow the Soule case because it's from California or not from California. It doesn't have to make that decision, because in the Callis case, it already adopted the Soule case and its reasoning. If you look at the decision in Callis, the court cited Soule and quoted its parenthetical in the following proposition. Consumer expectations test is only appropriate. It must be reserved, is the language, for situations in which consumers have everyday experiences, and in all other cases, that's the language from this court's opinion in Soule, quoting or this court's opinion in Callis, quoting the Soule case, the risk-utility must be used. Thank you, Your Honor.